[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 977 
Clarence Timmons, Jr. was indicted and convicted for the attempted murder of Lowndes County Sheriff John Hulett. Sentence was life imprisonment.
 I
Timmons argues that at trial the State should have been required to prove that he had a prior conviction for robbery and that the prosecution committed error in questioning him about an indictment for robbery and a conviction for grand larceny. The apparent confusion generated by this issue is caused by the fact that, although Timmons was charged with robbery, he pled guilty to a reduced charge of grand larceny with a five-year sentence. However, at the preliminary hearing and at trial, Timmons testified that he had been convicted of robbery.
Timmons testified at his preliminary hearing. Defense counsel's third question to Timmons was, "Would you tell us what your record is?" Timmons responded, "Well, strong armed robbery." Timmons testified that the robbery conviction was in 1976 and that he also had a conviction for felony escape in 1978.
At a pretrial hearing on the voluntariness of Timmons' confession, the assistant district attorney, in cross examining Timmons, asked whether he had signed a waiver of rights form "when you were charged with robbery back in 1979." Defense counsel interrupted the cross examination and stated, "If the district attorney makes a comment to the effect of the defendant having been charged with robbery in 1976 at trial, we will immediately move for a mistrial in that there is no record of a conviction for robbery in Lowndes County." (Emphasis added.) The trial court granted what it considered to be a motion in limine and ordered that there be no reference to the word "robbery" and instructed the prosecutor that at trial he would be limited to impeachment based on "what he was actually convicted of."
At trial, in presenting a defense, Timmons called County Commissioner Charles Smith, who testified that Timmons had a good general reputation and a good general reputation for truth and veracity in the community. On cross examination, the prosecutor asked over the objection of defense counsel whether "prior to September the 17th of '83 [the date of the shooting] had you heard rumors or reports that Charles Timmons was arrested and indicted for the offense or robbery? * * * And that he plead guilty to a reduced charge of grand larceny and was sentenced to a term of five years in the state penitentiary involving a Mrs. Bessy Smith in Lowndes County?" The witness acknowledged that he had heard that but testified that he still thought that Timmons had a good character.
The prosecutor's cross examination of Commissioner Smith was proper. "[I]f a witness testifies at the calling of the accused to the accused's good general reputation as a whole, the state, on cross-examination, may ask such witness whether, prior to the time of the alleged offense, he heard reports, rumors or statements derogatory of the accused." C. Gamble, McElroy'sAlabama Evidence § 27.01 (5) (3d ed. 1977). See also Aaron v.State, 271 Ala. 70, 83, 122 So.2d 360, 371 (1960); Wedgeworthv. State, 450 So.2d 195, 196 (Ala.Cr.App. 1984). *Page 978 
After testifying at the preliminary hearing but before trial, witness Willie Smith died. At trial, the defense introduced Smith's prior testimony. In that testimony, Smith admitted having been convicted of robbery in 1977 and that Timmons "was involved in the same robbery."
At trial, Timmons testified on his own behalf. In response to his lawyer's questions on direct examination, he testified that he had "been in trouble before with the law," that he had served time in the county jail but never in the penitentiary, and that he did not know which specific crimes he had been charged with but that "(t)he district attorney out of Lowndes County should know what it is. He should have it on file."
On cross examination, the prosecutor revived this line of questioning and the following occurred:
 "Q. [MR. THORNTON, ASSISTANT DISTRICT ATTORNEY]: Your lawyer was questioning you about whether or not you ever did any time in the penitentiary?
"A. Yes, sir.
 "Q. And you said no, you did your time in the county jail?
"A. Yes, sir.
 "Q. Well you were sentenced to penitentiary time; weren't you?
 "A. Sir, I knew I was sentenced to time. I was young and I didn't know what. The only thing I knew I was sentenced to five years, sir.
 "Q. Five years, in the penitentiary. And you know that the reason you didn't go to the penitentiary is because they were too full and you had to stay there in the county jail; didn't you?
"A. I don't know, sir.
 "MR.BENO [Defense Counsel]: Objection, Your Honor, that calls for a conclusion.
 "THE COURT: I sustain the objection and ask you to exclude that answer from your consideration.
 "Q. (By Mr. Thornton:) You have already stated here this morning or this afternoon to these ladies and gentlemen of the jury that you don't know what you were sentenced for. Now do you want to stand on that statement?
 "A. Sir, well I knew what had happened. But I didn't know what I was sentenced for, sir. Because I was along with what — what had happened. I didn't rob anyone. I knew that. But I still was charged with grand larceny, sir.
 "Q. Do you mean you were charged with robbery and sentenced to grand larceny?
 "MR.BENO: Your Honor, at this point we move for a mistrial, based on the statement of the prosecution.
"THE COURT: Deny the motion for mistrial.
"A. Excuse me sir?
 "Q. (By Mr. Thornton:) Tell these ladies and gentlemen of the jury what you were sentenced for?
 "A. Well, sir, you should know, sir, because you were the district attorney.
"THE COURT: Answer the question.
 "A. I actually don't know, sir. I mean, like I say I — only thing I knew I was sentenced, sir.
"Q. You were —
 "A. I thought it was robbery. I don't know, sir. One of them."
At this point, defense counsel made his objection at the bench, outside of the hearing of the jury, and demanded that the State prove that Timmons had a conviction for robbery.
From the record before this Court, it is a fact that Timmons was indicted for robbery but pled guilty to grand larceny. When the trial judge stated that this was his understanding, defense counsel stated, "We deny it. * * * Because of the habitual offender statute, Your Honor, and because he doesn't know what he was convicted of." This denial prompted the trial court to ask defense counsel, "Does truth have anything to do with this?"
Defense counsel rejected the trial court's offer to stipulate to the jury that Timmons had only been convicted of grand larceny. The trial court tendered this suggestion *Page 979 
after defense counsel complained that the prosecution had left the jury with the impression that Timmons had been convicted for robbery.
In its oral charge to the jury, the trial court stated: "One thing I want to clarify for you is this: The State stipulates that there has been no conviction of this — no prior conviction of this defendant for robbery. As for any other prior convictions, it would be a matter for you to decide whether there have been such convictions based on the evidence in this case."
At the sentencing hearing, the State proved, through the introduction of certified copies of the minute entries, that Timmons had two prior convictions: a 1978 conviction for escape and a 1977 conviction for grand larceny. This last minute entry shows that Timmons was indicted for robbery, that the robbery charged was reduced, and that Timmons pled guilty to grand larceny and received a five-year sentence. The trial court denied the State's application that Timmons be treated as a habitual offender "simply so that the Appeals Court doesn't have to be concerned with whether or not the record is appropriately clear." The trial court sentenced Timmons to life, finding that "[t]he facts of this case are such on their own merit and without consideration of any application of the habitual offender act to justify life in the penitentiary." With two prior felony convictions, the mandatory sentence under the Habitual Felony Offender Act was "imprisonment for life or for any term of not less than 99 years." Alabama Code 1975, Section 13A-5-9 (b)(3).
The rule is that a defendant, testifying for himself, cannot be cross examined, against his objection, as to former indictments against him for other offenses. Smith v. State,79 Ala. 21, 23 (1885). "As a general rule, however, a defendant who takes the stand in his own behalf during a criminal trial can be questioned on cross examination about prior convictions for crimes involving moral turpitude." Ex parte McIntosh,443 So.2d 1283, 1284 (Ala. 1983). Both robbery and grand larceny are crimes involving moral turpitude. McElroy §§ 145.01 (9)(k) and (q).
Since the confusion over whether Timmons had been convicted of robbery or grand larceny was perpetrated by Timmons himself, we find that Timmons has nothing about which to complain that was not caused by his own creation. The record affirmatively shows that before trial defense counsel knew that Timmons "thought" he had been convicted of "armed robbery" and that, at trial and before Timmons testified, counsel also knew that his client had not been convicted of robbery but had been "convicted of grand larceny in that matter." This matter approaches the doctrine of invited error under which a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby. Dunn v. State, 277 Ala. 39, 43,166 So.2d 878, 881 (1964); Russell v. State, 202 Ala. 21, 22,79 So. 359, 360 (1918); Travis v. State, 397 So.2d 256, 262
(Ala.Cr.App.), cert. denied, 397 So.2d 265 (Ala. 1981).
The prosecution was entitled to examine Timmons orally about his conviction for a crime of moral turpitude. Rush v. State,253 Ala. 537, 542, 45 So.2d 761, 765-66 (1950); Alabama Code 1975, § 12-21-162. If Timmons had denied any conviction, the State would have been entitled to prove that he had been convicted by "the original court record of the conviction or a certified or sworn copy thereof." McElroy, § 145.01 (16). However, on cross examination, the prosecution is not required to prove the prior convictions of the accused by a certified copy of the court records, where the accused has testified to the prior convictions on direct examination. Bosarge v. State,273 Ala. 329, 336-37, 139 So.2d 302, 308-09 (1961).
Furthermore, any false impression by the jury created by Timmons' own testimony was cured when the trial court instructed the jury that Timmons had not been convicted of robbery. See Wright v. State, 354 So.2d 838 (Ala.Cr.App. 1977), cert. denied, 354 So.2d 842 (Ala. 1978). *Page 980 
Defense counsel's denial of any conviction was a tactic obviously aimed at avoiding the rule that, when at trial a defendant admits his conviction of a crime, he relieves the State from proving the prior conviction for purposes of the Habitual Felony Offender Act and enhancement of punishment.Nilson v. State, 412 So.2d 1262 (Ala.Cr.App. 1982); Peoples v.State, 415 So.2d 1230 (Ala.Cr.App. 1982).
Timmons' assertion that the State should have been required to prove his prior conviction for robbery under Brady v.Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), is confusing at best. Brady held that a prosecutor's failure to disclose evidence favorable to an accused who specifically requests it violates the defendant's right to due process when the evidence is material to guilt or punishment. Brady relates to disclosure of evidence favorable to the accused, not to requiring the prosecution to contradict a defendant's own testimony or to prove facts which do not exist. Obviously,Brady has no application to these facts.
With regard to this issue in its oral charge to the jury, the trial court stated:
 "As for any other prior convictions, it would be a matter for you to decide whether there have been such convictions based on the evidence in this case. That evidence is available for a limited purpose only and can only be considered for a limited purpose. And I will find it in just a minute. Ladies and gentlemen, I do not find the note that I had concerning that. But I will tell you that evidence of prior convictions can be considered by you only for the purpose of impeachment. That is only to call into question the defendant's testimony. It is not in any sense to be considered as substantive matters bearing on the guilt or the innocence of the defendant in this case. The fact that he may have been convicted of a crime previously — or may not, that will be up to you to determine — certainly does not mean that he is guilty or not guilty of the present offense. And that's what I mean when I say that's not a substantive piece of evidence. It only has to do with whether or not you believe his testimony.
 "And you are the judges as to how much weight is to be given to all of those matters."
Defense counsel objected because "there was no direct evidence introduced by the prosecution" to prove a prior conviction. We have already demonstrated that Timmons' own admission was proper proof of his prior conviction. This instruction was proper. Rollings v. State, 160 Ala. 82, 90,49 So. 329, 332 (1909).
 II
Timmons accuses the trial judge of misconduct and argues that the trial court "had an abiding and conclusive impression of the Defendant's guilt", "directed the Defense Attorney in how to pursue and present evidence", "looked into the propriety of the Defense Counsel's investigation of the case", "rehabilitated the State's witnesses when their testimony failed to follow the line or theory of the State", and "stated his opinion in front of the jury as to a disputed fact." Appellant's Brief, pp. 19-21.
Our review of the alleged incidents of judicial misconduct cited by Timmons convinces this Court that this argument is without factual or legal merit. Some of the allegations are simply not supported by the record. In other allegations, the comments of the trial judge are taken out of context. In every instance of alleged misconduct, we find that no error was committed by the trial court.
Under the circumstances in which it occurred, the one instance wherein it is alleged that the trial judge misstated the evidence was virtually innocuous. From the record:
 "THE COURT: Do you know whether or not Clarence Timmons pulled the trigger any additional time after the three shots were — *Page 981 
 "MR. BENO: Your Honor, we are going to object. His testimony is that he fired two shots.
 "THE COURT: Okay. I apologize if that is your testimony. And Ladies and Gentlemen it will be up to you to decide what the testimony is with regard to any detail."
Our review of Sheriff Hulett's testimony reveals that he stated that three shots were fired. Other witnesses testified that they only heard two shots.
A trial judge may "pose questions to a witness for the purpose of clarifying the issues for the jury's consideration and to aid in the orderly conduct of the trial process."Richardson v. State, 403 So.2d 297 (Ala. 1981). "The trial judge has the right to propound such questions to witnesses as may be necessary to elicit certain facts, . . .; and it not only is the court's prerogative to so act, but its duty, if the court deems it necessary to elicit proper evidence bearing on the issues." Rice v. Hill, 278 Ala. 342, 343, 178 So.2d 168,169 (1965) (citations omitted). "[W]ith certain exceptions, no rule of law exists which limits the power of a judge in a criminal trial to interrogate a witness during his examination. He may ask any question which either the state or the accused had the right to ask, or which it was their duty to ask, but which has been omitted, if the answer may be relevant." Holmesv. State, 22 Ala. App. 373, 115 So. 849 (1928). "The unquestioned province of the court — in fact, the solemn and sacred duty of a trial judge — is the development and establishment of the truth, and in this connection it is always permissible for the court, and if it appears necessary for him to do so it is his duty, to propound to witnesses such questions as it is deemed necessary to elicit any relevant and material evidence, without regard to its effect, whether beneficial to the one party or the other." Brandes v. State,17 Ala. App. 390, 391, 85 So. 824, 825 (1920).
The trial court's comments to defense counsel ("Mr. Beno, don't comment on the importance of your questions. I assume that you are not going to ask any unimportant questions." * * * "Mr. Beno, in order to proceed as you are doing, the next question you have to ask the witness is whether or not that was his testimony at that time." * * * "Mr. Beno, it occurs to me that, from listening to what I have heard about it, that there has been a tremendous misunderstanding if you asked this young girl what she heard * * * [T]here is an excellent possibility that you have a great misunderstanding with this witness" with respect to whether the witness was testifying to what Timmons actually said or to what she had heard other people say) were not of the type designed to humiliate counsel and prejudice his client. Cf. Powell v. State, 20 Ala. App. 606, 609, 104 So. 551,553 (1925). The last quoted comment was not made before the jury. "`A judge is not to be severely criticized for his pointedly bringing the bad habit to the attention of the attorney.' Jones v. State, 398 So.2d 360, 367 (Ala.Cr.App.), cert. denied, 398 So.2d 369 (Ala. 1981)." Smith v. State,447 So.2d 1327, 1331 (Ala.Cr.App. 1983), affirmed, 447 So.2d 1334
(Ala. 1984). Here, we find no indication in the record that the trial court expressed an opinion on any disputed fact, or used any language which tended either to bring defense counsel into contempt before the jury or to prejudice counsel or his client.Sprinkle v. State, 368 So.2d 554, 561-62 (Ala.Cr.App. 1978), cert. quashed, 368 So.2d 565 (Ala. 1979); Dennison v. State,17 Ala. App. 674, 676, 88 So. 211, 213 (1921).
A careful review of the entire record, in addition to a consideration of the specific allegations of judicial misconduct, convinces this Court that the trial court did not depart or waiver from the required standard of fairness and impartiality. The record evidences the conscientious efforts of the trial court to secure for Timmons a fair and impartial trial.
 III
Prior to trial, Timmons filed a motion to require the prosecution to disclose evidence favorable to defendant underBrady v. *Page 982 Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In response, the trial court stated, "It is the general order of the court that any exculpatory material be furnished." On appeal, Timmons argues that the "trial is shot full of incidents where the Brady motion was not applied," [Appellant's Brief, p. 16] and contends that under Brady the prosecution should have been required (1) to prove that he had a prior conviction for robbery, (2) to show that the warrant of arrest was found at the scene of the shooting, (3) to disclose the names of the "100 potential witnesses who were interviewed," and (4) to produce the past convictions of the State's witnesses.
This issue is without any legal or logical merit. In Brady, the United States Supreme Court held that a prosecutor's failure to disclose evidence favorable to an accused who specifically requests it violates the defendant's right to due process when the evidence is material to guilt or punishment.373 U.S. at 87, 83 S.Ct. at 1196-97, 10 L.Ed.2d 215. The record shows no violation of this rule. The trial court stated, "I would like for the record to show that I ever [which we interpret as `even'] reviewed the state's entire investigative file for any exculpatory material and I found none other than the defendant's own statement and I did not see anything else, I don't think, that warranted any notation."
Ground (1) of this issue has already been covered in Issue I of this opinion. Ground (2) is without merit because the State proved that the arrest warrant was at the scene of the shooting. True, there was no proof of what happened to the warrant after the shooting, but, as discussed in Issue IV, the document was properly identified and authenticated. More significantly, where the warrant was found after the shooting was not exculpatory of Timmons' guilt.
Ground (3) is equally without merit. Lowndes County Chief Sheriff's Deputy Julius Bennett testified that, in "following leads," he and Alabama Bureau of Investigation Investigator Charles Gibson "probably talked to a possible hundred people." He stated that there was no way to determine who those people were. Timmons does not allege that any of these "potential witnesses" could or would have provided testimony favorable to his defense.
"A motion for discovery is not a mere `fishing expedition.' . . . The accused is simply not entitled to pursue a `scatter gun' approach in his motion to produce." Perry v. State,371 So.2d 969, 970 (Ala.Cr.App.), cert. denied, 371 So.2d 971 (Ala. 1979) (citations omitted). Brady "did not envision the type `fishing expedition' requested by appellant." Giddens v. State,333 So.2d 615, 618 (Ala.Cr.App. 1976). "It is not error for a trial court to refuse to order a prosecuting attorney to produce and make available for inspection by an accused statements given by state witnesses to the prosecuting attorney or to compel the District Attorney to identify and produce the whereabouts of a witness or witnesses who allegedly were eyewitnesses to the incident in question." Allen v. State,414 So.2d 163, 166 (Ala.Cr.App. 1982).
Again, Timmons has shown the existence of no exculpatory information which the State has failed to produce. The mere possibility that some unknown witness might have been able to provide such information constitutes mere speculation and furnishes no ground for relief under Brady.
As with grounds (1), (2), and (3), Timmons has failed to bring himself within the parameters of Brady with regard to ground (4). There is no evidence that any State witness has a past conviction. The prosecution cannot be guilty of failing to produce something which does not exist. Brady presupposes the actual existence of evidence favorable to the accused and material either to guilt or punishment. Bailey v. State,421 So.2d 1364, 1369 (Ala.Cr.App. 1982). There must be some showing that such exculpatory and influential evidence actually exists before a constitutional violation of the Brady rule may be found. Bailey, 421 So.2d at 1368-69. *Page 983 
 IV
Over the objection of defense counsel, the trial court admitted into evidence the warrant of arrest which Sheriff Hulett testified he had attempted to serve on Timmons when the shooting occurred. Timmons argues that this admission was error because the prosecution did not establish any chain of custody.
When the warrant was marked for identification, Sheriff Hulett testified, "Yes, Sir, that's the one [writ of arrest] that I had that day." When the warrant was offered, defense counsel's only objection was "we object." This is insufficient to preserve the alleged error for review.
Although Timmons vigorously contends that the Sheriff did not have any warrant when he attempted to arrest him, several witnesses, including the Sheriff, clearly contradicted this assertion. Defense counsel was never able to present any evidence or testimony before the jury that the Sheriff had no warrant.
The prosecution was not required to prove the chain of custody of the arrest warrant. "A record is proved by its own mere production and inspection, without more, whether of the original or of a copy." King v. Martin, 67 Ala. 177, 181
(1880). The Sheriff's identification of the warrant was sufficient authentication. See generally, C. Gamble, McElroy'sAlabama Evidence § 320.01 (3d ed. 1977).
In this particular case, it was the presence of the arrest warrant at the scene of the arrest rather than the authenticity of the warrant that was questioned. Moreover, in accord with the general rule, the actual authenticity of the warrant was not significant or material to the issues in this case. "An officer may safely obey all process fair on its face, and if a warrant is for an offense within the jurisdication of the officer issuing it, and the crime charged is described with sufficient precision to apprise the accused of the offense with which he is charged, it will protect the officer, so that killing him in resistance of its execution will be murder. And in such case, the production of the warrant is all that is required; the prior proceedings cannot be investigated." F. Wharton, The Law of Homicide § 392 (3d ed. 1907). See alsoBrown v. State, 109 Ala. 70, 87-88, 20 So. 103, 109-110 (1896). "If it appears that the process or warrant was fair on its face, its legality is sufficiently established. Proceedings leading up to the issuance of the process may not be investigated." 40 Am.Jur.2d Homicide § 106 (1968).
 V
Timmons argues that the trial court erred in sustaining the State's objection to defense counsel's closing argument. The record shows the following exchange:
 "[Defense Counsel]: She [witness Linda McCray] finally said well I heard it. I suggest her demeanor shows fear. The people in Lowndes County are so afraid of this man —
 "MR. THORNTON [Assistant District Attorney]: We object to that judge. There is no evidence to that and ask that it be stricken.
 "(Bench discussion out of the hearing of the jury as follows:)
 "MR. BENO [Defense Counsel]: Your Honor, I think there is a reasonable inference.
"THE COURT: What evidence do you base that on?
 "MR. BENO: The little girl started crying. You personally heard the little girl change her testimony several times. And also —
 "THE COURT: I sustain the objection and instruct counsel to limit themselves to matters that are supported by evidence."
This comment must be considered within the proper context and the evidence presented at trial. The defense called witness Linda McCray to testify that she heard the Sheriff say that he must have left the arrest warrant in another car or at the office. Counsel asserted that McCray had signed a statement to that effect. However, McCray testified that she did not personally hear the Sheriff make that *Page 984 
statement but was only repeating what she had heard from other people. Another witness, Hermain McCall, testified that McCray was "mainly talking about what she heard cause she wasn't really out there when the accident happened." McCall also testified that his mother told defense counsel that McCray "wasn't around there."
After an extensive hearing on McCray's testimony, held outside of the jury's presence, the trial court stated, "Based on what I have heard from the testimony I think there is an excellent possibility that you [defense counsel] have a great misunderstanding with this witness."
When witness McCray testified, the trial court asked her to answer the questions "out loud" and commented:
 "It looks to the Court like you are a little bit nervous. And I want to tell you that it's important for you to maintain your calm and don't get scared now where you can't answer the question. Just listen very carefully to what the lawyer says and answer the questions. Nobody is going to bother you and there is nothing for you to be concerned about other than just telling what you remember. I will ask Mr. Beno to ask you questions in a quiet tone of voice and allow you the witness to respond."
The witness testified that she was "not really scared, just nervous."
There was absolutely no evidence at trial or in the record that any witness or any person was afraid of, or intimidated by, the Sheriff of Lowndes County with regard to testifying at trial.
Throughout the trial, defense counsel insinuated that the Sheriff had tampered with the witnesses. Defense counsel, although having been given the opportunity and having attempted to prove such allegations, was totally unable to susbtantiate any such claim. The trial court made the specific finding: "I don't find, based on what you have presented to me, that there has been any tampering with the witnesses that would prevent a fair trial in this case." At one point in the trial, the court found that the insinuations of defense counsel were a "deliberate attempt to prejudice the jury" and later found that "there is no basis in that testimony that I heard previously for any finding or any suggestion that the Sheriff has interfered with the prosecution of this case."
The trial court properly refused to allow defense counsel to argue or imply that witness McCray was afraid of the Sheriff because that contention was not based on any evidence presented at trial. "Counsel [are] allowed, within limits, to draw their own conclusions and to express their arguments in their own way, provided, of course, they do not travel out of the record or make use of unfair means to create prejudice in the minds of the jury." Garrett v. State, 268 Ala. 299, 303, 105 So.2d 541,544 (1958); Jordan v. State, 267 Ala. 361, 365-66, 102 So.2d 4,8 (1958). "Where there is no evidence in a case to support the remarks of counsel, they are properly excluded." Ray v. State,248 Ala. 425, 429, 27 So.2d 872, 875 (1946). Defense counsel has "no right to create evidence by his argument." Davis v.State, 49 Ala. App. 587, 590, 274 So.2d 360, 363 (1972), cert. denied, 290 Ala. 364, 274 So.2d 363 (1973).
 VI
Timmons contends that the trial court erred in instructing the jury on the use of deadly force in resisting an arrest. The substance of the court's charge on this issue was that the defendant had the right to use reasonable physical force to resist an illegal arrest, but under no circumstances would he be justified in using deadly physical force to resist. The trial court also charged, as stated in Alabama Code 1975, §13A-3-28, that "[a] person may not use physical force to resist a lawful arrest by a peace officer who is known or reasonably appears to be a peace officer."
The basis for defense counsel's exception to the trial court's instructions was grounded on the principle that a person sought to be arrested may use deadly physical force in resisting an unlawful arrest if such killing is necessary to save his own life or to *Page 985 
save himself from serious bodily harm. Sanders v. State,181 Ala. 35, 44-45, 61 So. 336, 339 (1913). See Annot., 44 A.L.R.3d 1078 (1972). The record reflects the basis for the objection:
 "MR. COOPER [Defense Counsel]: Judge, you were also saying something about the defendant is not justified in using deadly force when resisting arrest even though it is an unlawful arrest. Well, I think there is —
 "THE COURT: There are absolutely no exceptions to that rule.
 "MR. COOPER: Wait a second, let me finish your Honor. I think there is one exception and I am saying the law is that except if the officer is using deadly force himself to affect an unlawful arrest.
 "THE COURT: That would put you back squarely within the self-defense thing and your argument was accident. You are saying he didn't use deadly force and you can't have both. I am not going to charge on that. That's incorrect as a matter of law. If he wants to say I did it, I acted intentionally, then I will charge on self-defense. That is not his theory and that is —
 "MR. BENO: Our position is that however the gun went off was an accident. We're not saying whether he actually pulled the trigger or did not pull the trigger.
 "THE COURT: He didn't use deadly force if it was an accident."
The trial court did not charge the jury on the law of self-defense but instructed the jury as follows:
"Self-defense is not a defense in this case."
* * * * * *
 "In this case the defendant denies any intention to kill or harm the Sheriff. He contends that in the course of a struggle the Sheriff reached for his pistol and that the defendant attempted to prevent the Sheriff from drawing the pistol. The defendant contends that the pistol accidentally discharged and that [the] Sheriff's injury was accidental."
The trial court did not err in refusing or failing to charge the jury that a person is justified in using deadly physical force to. resist an unlawful arrest where the killing was necessary to save his own life or save himself from serious bodily harm. Such a charge was abstract under the particular facts and circumstances of this case.
Under the State's evidence, Timmons intentionally shot Sheriff Hulett while Hulett was attempting to place him under arrest. Under the evidence presented by the defense, the entire incident was a "tragic accident." Timmons himself testified in effect that he was not resisting arrest but was merely trying to free himself from the Sheriff's tight and uncomfortable grip when they both fell to the ground. Timmons testified that, during the ensuing struggle, he placed his hand on the Sheriff's hand when he saw the Sheriff reach for his pistol. When Timmons attempted to return the pistol to the Sheriff, the weapon accidentally discharged a second time. Timmons denied firing the pistol or shooting the Sheriff.
There was no plea of self-defense filed to the indictment. In closing argument, defense counsel repeatedly argued that the shooting was accidental and stated that "we are not at any point at anytime saying that Clarence Timmons had a right to shoot the Sheriff intentionally."
The defense was akin to "accidental self-defense," coupled with the assertions that Timmons did not intentionally shoot the Sheriff, did not use or attempt to use deadly physical force, and was not resisting arrest. Defense counsel stated: "[T]he reason he went back for the gun was to keep from getting shot but the gun going off was an accident." * * * "He went for the gun to prevent Sheriff Hulett from going for the gun. So that's resisting an unlawful warrant right there. That's self-defense right there and the gun going off was an accident." * * * "Now at the time he [Sheriff] apparently reached for his weapon, Your Honor, our position is Mr. Timmons was trying to keep himself from being shot over child support. . . . And *Page 986 
when he did that, in the tussle for the gun, according to his [Timmons'] testimony and he says I am not really sure how it happened but he says that the gun went off . . . accidentally." * * * "He grabbed his hand in order to defend himself and the gun goes off accidentally." Timmons' theory of "accidental self-defense" is not recognized as a legal defense.
 "Self-defense is an affirmative, positive, intentional act, and does not include an accidental killing; there can be no such thing as accidental self-defense. A claim of self-defense, however, does not presuppose an intentional killing: one may kill another in self-defense without any expectation of killing him." F. Wharton, The Law of Homicide § 220 (3d ed. 1907).
This rule has been followed in Alabama:
 "We note that `self-defense and accident are inconsistent defenses, and the defendant alone may not provide the basis for submitting such inconsistent defenses to the jury.' [State v.] Randolph, 496 S.W.2d [257] at 262 [(Mo. 1973)]; [State v]. Ameen, 463 S.W.2d [843] at 845 [(Mo. 1971)]. `Taking human life in self-defense is an affirmative, positive, intentional act, and the law does not recognize the anomalous doctrine of accidental self-defense.' State v. Whitchurch, 339 Mo. 116, 96 S.W.2d 30, 35 (1936) (citations omitted)." Wakefield v. State, 447 So.2d 1325, 1326
(Ala.Cr.App. 1983).
There was no evidence at trial to support the contention that Timmons used deadly physical force to protect himself in resisting an unlawful and felonious arrest. Under the facts, the shooting was either an intentional act committed while resisting arrest or a tragic accident. Therefore, any charge on Timmons' right to use deadly physical force in resisting an arrest would have been abstract and outside the evidence.Gautney v. State, 284 Ala. 82, 90, 222 So.2d 175, 182-183
(1969). "In the absence of any showing that the refused charge had application to the circumstances of the case as reflected by the record, we are of opinion that the charge was abstract, and for that reason its refusal was not error." Boggs v. State,270 Ala. 209, 211, 116 So.2d 903, 906 (1959).
In Edwards v. State, 452 So.2d 487 (Ala.Cr.App. 1982), reversed on other grounds, Ex parte Edwards, 452 So.2d 503
(Ala. 1983), a Mobile police officer attempted to arrest Edwards for a misdemeanor that was not committed in his presence without having the arrest warrant in his possession. Edwards refused to get in the patrol car and a struggle broke out between the two men. The officer struck Edwards with his flashlight and the two men fought over control of the officer's revolver, which the officer was attempting to remove from his holster. The officer and Edwards fell to the ground and continued to fight over the pistol. During the scuffle, the gun discharged killing the officer. 452 So.2d at 504. At trial, testimony was presented that, during the struggle, Edwards was attempting to prevent the officer from drawing his revolver, 452 So.2d at 492, and that Edwards was merely defending himself. 452 So.2d at 493. From the particular facts present inEdwards, this Court found that Edwards "established evidence of self-defense" which presented a question of fact for the jury.Edwards, 452 So.2d at 498.
Our Supreme Court found that Edwards was not justified in his degree of resistance to the unlawful arrest:
 "Alabama law is clear that, to a limited degree, a party is justified in attempting to resist an unlawful arrest.
 "`The citizen may resist an attempt to arrest him which is simply illegal, to a limited extent, not involving any serious injury to the officer. He is not authorized to slay the officer, except in self-defense; that is, when the force used against him is felonious, as distinguished from forcible. It is better to submit to an unlawful arrest, though made with force, but not with such force as to endanger the life or limb, than to slay the officer.'
 "Adams v. State, 175 Ala. 8, 12, 57 So. 591, 592
(1912). Clearly, the actions of *Page 987 
Edwards went beyond the lawful bounds of resistance to an illegal arrest." Edwards, 452 So.2d at 505.
A person's right to resist arrest was also discussed in Odomsv. State, 359 So.2d 1162, 1164-65 (Ala.Cr.App. 1978).
Since Timmons was not justified in using deadly physical force in resisting arrest, as the State's evidence proved, and since the defense proved that Timmons was not resisting arrest and did not use deadly physical force in resisting an arrest, the trial court properly refused to instruct the jury that deadly physical force may be used to resist an unlawful arrest where the accused's life or safety is in danger.
In sentencing Timmons to life imprisonment, the trial court found that "[t]he facts in the case indicate without question that what transpired in this case was the intentional act on the part of the defendant of taking the Sheriff's gun from him and shooting him in the back." The trial court found Timmons' "version of what happened totally impossible, factually":
 "It simply would not have been possible under the facts under the version for any reason that the Sheriff's hand was anywhere near the gun when the gun was discharged. That would defy all the laws of physics and all of the laws of nature. That leads inevitably to the conclusion that the defendant simply fired the shot directly into the back of the Sheriff and at a time when he was in no peril to himself. What this conclusion leads to is that the defendant in an effort to resist arrest by a law enforcement officer who was clad in the uniform of his office engaged in a struggle with that officer and deliberately and intentionally shot him. In doing so he struck down the very symbol of law and order and law enforcement in this state."
Our review of the entire record convinces this Court that Timmons received a fair trial. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.